**ANDREWS, Administrator of Wage and Hour Division, United States Department of Labor, v. MONTGOMERY WARD & CO., Inc., et al.**

**No. 864.**

District Court, N. D. Illinois, E. D.
Nov. 22, 1939.

George A. McNulty, Gen. Counsel, Irving J. Levy, Asst. Gen. Counsel, both of Washington, D. C., and Alex Elson, Regional Atty., and Lee K. Beznor, both of Chicago, Ill., for plaintiff.

John A. Barr, R. F. Walker Smith, and Stuart S. Ball, all of Chicago, Ill., for defendant.

HOLLY, District Judge.

Elmer F. Andrews, Administrator of the Wage and Hour Division of the United States Department of Labor, has filed his petition herein praying that an order be issued directed to Montgomery Ward & Co., Inc., a corporation, and Stuart S. Ball, Secretary of Montgomery Ward & Co. Inc., to show cause why they should not be required to appear before the Commissioner, or one of the officers designated by him, at such time and place as the court might direct and there produce the books, papers and documents described in a subpœna theretofore issued. The subpœna commanded the respondents to produce at the time and place therein named any and all of the reports and records entitled by respondents "Gross Earnings Report" containing all entries pertaining to wages paid to respondents' employees employed in its mail order branch at Kansas City, Missouri, for the period beginning with the week ending October 27, 1938, to and including April 11, 1939, both inclusive, to-

gether with the time clock cards for each of said employees for said period, and records showing the number of hours scheduled for each of the departments of said branch at Kansas City, Missouri, for the same period and the number of hours actually worked by each of said departments during said period.

Petitioner averred that the respondent is a corporation with its principal executive offices in Chicago, Illinois, and is engaged in a general merchandising business through nine mail order houses, three retail pools, six hundred retail stores and one hundred fifty order offices for mail order business located in all but one of the forty-eight states; that the Kansas City plant, consisting of the mail order house and a retail store, is the second largest of respondent's plants; that at least 80% of the goods and merchandise received by said branch is shipped from sources from without the state; that it supplies merchandise to about sixty-five retail stores of respondent situated in the State of Missouri as well as five other states; that sales are made directly to consumers in the various states, the net sales during the year 1936 totalling $16,-000,000, and that respondent is in these and other ways an employer of employees engaged in Interstate Commerce, or in the production of goods for Interstate Commerce, within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219.

Petitioner further averred that the respondent, Stuart S. Ball, as secretary of Montgomery Ward & Co., is a resident of Illinois within the jurisdiction of this Court.

It is further set forth in this petition that the Administrator, having reasonable grounds to believe that the respondent, Montgomery Ward & Co., had been and was in its said business violating the provisions of Sections 7, 11(c), 15(a) (1), 15(a) (2), 15(a) (3) and 15(a) (5) of the act as well as regulations issued thereunder, designated certain persons as officers of the Wage and Hour Division pursuant to Section 11(a) of the Act to investigate and gather data regarding wages and hours and other conditions and practices of employment in the respondent's said place of business, and such other matters as would be necessary and appropriate to determine whether respondent had violated the provisions of the Act; that pursuant to said designation the said agents requested respondents for the books and records re-

lating to earnings and hours of the employees of respondent, Montgomery Ward & Co., in its said mail order house in Kansas City, Missouri, but the request was refused, whereupon the administrator, having found that there was reasonable ground for believing that respondent. was violating the aforesaid provisions of the Act, executed an order that investigation be made to determine whether Montgomery Ward & Co. or its various agents or employees had violated or were violating any of the provisions of the Act or regulations promulgated pursuant thereto and authorized certain persons as officers of the Wage and Hour Division, and each of them, to investigate and gather such data, enter and inspect such plants and such records and perform all other duties authorized in said order.

A subpœna duces tecum was issued, duly executed by said Administrator requiring respondents to appear before Alex Elson, regional attorney and officer of the Wage and Hour Division, at a time therein specified, and produce the books and papers heretofore referred to, which said subpœna was duly served upon the above respondents, said Stuart S. Ball, being secretary of Montgomery Ward & Co., and in charge and having custody and control of said books, papers and documents called for by the subpœna, but said respondents, though appearing, refused to produce the books, papers and documents called for by said subpœna though the said books, papers and documents are essential to the Administrator for the purpose of determining the amount of earnings of the employees and whether said employees have received the wages required by the Act.

It is further averred in the petition that at the time respondents appeared before said Alex Elson it was stated in their behalf that the company did not have a record of hours actually worked by each of the departments in the Kansas City Mail Order House which statement was accepted by the Administrator, and the Administrator is not asking that a record showing the hours actually worked by each of the departments of the Kansas City Mail Order House for said period be produced.

The respondents filed an answer in which they set up as a defense that the subpœna called for the production of books, papers and documents for all employees employed in the Kansas City Mail Order House of Montgomery Ward & Co. which included

employees who are not engaged in commerce or the production of goods for commerce as these terms are defined by the Fair Labor Standards Act of 1938, employees who are engaged in purely intrastate activities, including those who are employed in bona fide local retailing capacities, and employees who are employed in bona fide administrative and executive capacities; that none of the books, papers and documents called for by the subpœna furnish any proper basis for determining which of the employees in the Kansas City Missouri Mail Order House are exempt from the operation of the Fair Labor Standards Act of 1938, nor do they contain or disclose sufficient facts from which it can be ascertained which of the employees at said mail order house are exempt from the operation of the Fair Labor Standards Act of 1938.

The respondent, Stuart S. Ball, set up as a separate defense that he did not have custody of the books, papers or documents set up in the subpœna. Other defenses are set up which are not necessary to note for the purpose of this opinion, the gist of the answer being that the books, papers and documents called for by the subpœna are not necessary or appropriate to determine whether respondent, Montgomery Ward & Co., has violated the provisions of the Fair Labor Standards Act as set forth in the petition and that the subpœna constitutes an unreasonable search and seizure against which respondents are protected by the Fourth Amendment to the Constitution of the United States, U.S.C.A.

It is further urged that the Fair Labor Standards Act is unconstitutional in that it would operate to deprive respondent, Montgomery Ward & Co., of property without due process of law.

Attached to the answer is a motion to quash the subpœna on the same grounds set up in the answer.

The provisions of the Fair Labor Standards Act of 1938, U.S.C.A. Title 29, Ch. 8, §§ 201–219, so far as applicable to this case, are set forth in the margin. [1]

---

1 "§ 201. This chapter may be cited as the 'Fair Labor Standards Act of 1938'. June 25, 1938, c. 676, § 1, 52 Stat. 1060."

"§ 203. * * * (b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof. * * * c. 676, § 3, 52 Stat. 1060."

"§ 206. (a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—
"(1) during the first year from the effective date of this section, not less than 25 cents an hour. * * * c. 676, § 6, 52 Stat. 1062."

"§ 207. (a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—
"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section. * * * c. 676, § 7, 52 Stat. 1063."

"§ 211. (a) The Administrator or his designated representatives may investigate and gather data regarding the wages, hours, and other conditions and practices of employment in any industry subject to this chapter, and may enter and inspect such places and such records (and make such transcriptions thereof), question such employees, and investigate such facts, conditions, practices, or matters as he may deem necessary or appropriate to determine whether any person has violated any provision of this chapter, or which may aid in the enforcement of the provisions of this chapter.

*      *      *      *      *

"(c) Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder. * * * c. 676, § 11, 52 Stat. 1066."

"§ 215. (a) After the expiration of one hundred and twenty days from the date of enactment of this chapter, it shall be unlawful for any person—
"(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206, or section 207, or in violation of any regulation or order of the Administrator issued under section 214; except that no provision of this chapter shall impose any liability upon any common carrier for the transportation in commerce in the

The Act provides for a minimum wage for employees engaged in interstate commerce. of not less than twenty-five cents an hour for the first year from the effective date of the Act and that during such period the working week shall be no longer than forty-four hours. For the purpose of the enforcement of the act there was created in the Department of Labor a Wage and Hour Division, with an official known as the Administrator at its head. The Administrator is given power through himself or his designated representatives to investigate and gather data regarding the wages and hours and other conditions and practices of employment in any industry subject to the Act as he may deem necessary or appropriate to determine whether any person has violated any of the provisions of the Act and every employer is required to keep such records of the persons employed by him and of the wages and hours of employment, and preserve such records for such periods of time, and make reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary and appropriate for the enforcement of the provisions of the Act. And for the purpose of any hearing or investigation provided for in the act, the provisions of sections 49 and 50 of Title 15, U.S. Code, 15 U.S.C.A. §§ 49, 50, relating to the attendance of witnesses and the production of books and papers are made applicable to the jurisdiction of the Administrator. Employees employed in a bona fide executive, administrative, professional or local retailing capacity, or any employee the greater part of whose selling or service is intrastate commerce are exempted from the provisions of the Act. It is made an offense, punishable by fine or imprisonment or both, to transport, ship or deliver or sell in interstate commerce any goods in the production of which any employee was employed in violation of the provisions of said Act concerning wages and hours of labor.

Counsel for Montgomery Ward & Co., have argued first that the Fair Labor Standards Act of 1938 is unconstitutional and, second, that to compel the production of the documents called for by the subpœna would constitute an unreasonable search and seizure forbidden by the Fourth Amendment to the Constitution.

First: Is this Act a valid exercise of the power given to Congress to "regulate commerce with foreign nations, and among the several states, and with the Indian Tribes" (U.S.C.A.Const. art. 1, § 8, cl. 3) or, as it is commonly expressed, the power to regulate interstate commerce?

This power, as the Supreme Court said in Gibbons v. Ogden, 9 Wheat. 1, 196, 6 L.Ed. 23, is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." The power is supreme and plenary. Minnesota Rate Cases, 230 U.S. 352, 398, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann. Cas.1916A, 18. The power to regulate is the power to prohibit. Lottery Cases, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492.

The only limitation on the exercise of this power is the provision of the Fifth Amendment, U.S.C.A.Const., that no person shall be deprived of life, liberty or property without due process of law. But, "in the exercise of its control over interstate commerce, the means employed by the Congress may have the quality of police regulations". Kentucky Whip & Collar Co. v. Illinois C. R. Co., 299 U.S. 334, 57 S.Ct. 277, 280, 81 L.Ed. 270. Certainly it cannot be maintained now that Congress may not, in the interests of the general welfare of the country, prohibit the shipment in interstate commerce of the products of under paid and sweated labor. Kentucky Whip & Collar Co. v. Illinois C. R. Co., supra, Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; U. S. v. Royal Rock Co-operative Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446, decided June 5, 1939.

Regulations of wages and hours of labor is a proper exercise of police power. Employer and employee do not stand on a plane of equality. Wages, especially of unskilled employes, tend towards the lowest point at which the laborer can subsist.[2] The resulting conditions are of interest not only to the wage earner but the whole community. The slums of our great cities are, in large part, the fruits of low wages. Vice, crime and disease breed in these districts and spread throughout the community. Certainly, if it is within the power of the state to regulate the com-

---

regular course of its business of any goods not produced by such common carrier, and no provision of this chapter shall excuse any common carrier from its obliga-

tion to accept any goods for transportation. * * * c. 676, § 15, 52 Stat. 1068."

[2] See Wealth of Nations, Ch. VIII.

missions that may be paid to insurance agents,[3] it is not an unwarranted exercise of the police power to prescribe minimum wages for the protection of the health and good order of society.

It is not necessary for me to determine whether all the provisions of the Act are within the power of Congress. I am of the opinion that Congress has power to prohibit the transportation in interstate commerce of goods produced in violation of the Act. If there are sections in the Act which exceed the power of Congress they are clearly separable and do not vitiate the whole Act. Electric Bond & Share Co. v. Securities & Exchange Commission, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.

Second: Does the command of the subpœna to produce the books and papers therein mentioned constitute an unreasonable search and seizure?

By section 11(c) of the Act (U.S. C.A. Title 29, Ch. 8, Sec. 211(c), the employer is required to make, keep and preserve such records of the persons employed by him and of the wages and hours of employment maintained by him and make such reports therefrom as the Administrator shall prescribe by proper regulation. It appears from the averments of the petition that the Administrator has prescribed rules concerning the keeping of such records and, as I understand from the arguments of counsel, the documents called for by the subpœna are those required by the Act to be kept and that show the wages and hours of the employees.

I am of the opinion that Congress had power to require the keeping of the records and that the Administrator may, at his pleasure, require the production of such records.

In Electric Bond & Share Company et al. v. Securities & Exchange Commission, supra, the Supreme Court was called upon to determine the validity of sections 4 and 5 of the Public Utility Act of August 26, 1935, 15 U.S.C.A. §§ 79d, 79e. Section 4 of that Act denied the right to holding companies not registered under the act to use the mails or any means or instrumentality of interstate commerce to distribute or make public offering of any security of such holding company, or any subsidiary of such holding company. It also prohibited such company from engaging in other forms of interstate commerce. To become a registered holding company the Act (Sec. 5) required the corporation to file with the Securities and Exchange Commission copies of its charter or articles of incorporation and furnish detailed information concerning its business for five years preceding the application for registration. The Electric Bond & Share Company and various other corporations attacked the Act as unconstitutional, both in general and particularly as to the provisions of sections 4 and 5. The Court sustained the validity of Sections 4 and 5 saying, (303 U.S. page 437, 58 S.Ct. page 684, 82 L.Ed. 936, 115 A.L.R. 105), "Regulation requiring the submission of information is a familiar category. Information bearing upon activities which are within the range of congressional power may be sought not only by congressional investigation as an aid to appropriate legislation, but through the continuous supervision of an administrative body."

In their first brief counsel for respondent said:

"We do not question the right of Congress to permit administrative bodies to issue subpœnas *in order to obtain the evidence of a suspected violation of law.* We have at all times been willing to comply with a proper subpœna—a subpœna limited to those subjects where a reasonable mind could see a reasonable necessity or relevance." (Italics mine.)

Though making this admission as to the rights of the Government, in other portions of the brief counsel for respondents contend that the court should not command obedience to the subpœna unless or until petitioners make proof that respondent has violated the law, or at least, that petitioner has reasonable grounds to believe the respondent has been guilty of such violation.

In Hale v. Henkel, 201 U.S. 43, 26 S. Ct. 370, 379, 50 L.Ed. 652, a grand jury had started an investigation to determine whether certain corporations were guilty of violating the anti-trust laws. Hale, secretary and treasurer of one of the corporations under investigation, was served with a subpœna commanding him to produce certain books and papers of the

[3] O'Gorman & Young v. Hartford Fire Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163.

corporation. He refused contending that the command constituted an unreasonable search and seizure. But the court said: "* * * the corporation is a creature of the state. It is presumed to be incorporated for the benefit of the public. It receives certain special privileges and franchises, and holds them subject to the laws of the state and the limitations of its charter. Its powers are limited by law. It can make no contract not authorized by its charter. Its rights to act as a corporation are only preserved to it so long as it obeys the laws of its creation. There is a reserved right in the legislature to investigate its contracts and find out whether it has exceeded its powers. It would be a strange anomaly to hold that a state, having chartered a corporation to make use of certain franchises, could not, in the exercise of its sovereignty, inquire how these franchises had been employed, and whether they had been abused, and demand the production of the corporate books and papers for that purpose."

And again (201 U.S. page 75, 26 S.Ct. page 379, 50 L.Ed. 652) the court said: "While an individual may lawfully refuse to answer incriminating questions unless protected by an immunity statute, it does not follow that a corporation, vested with special privileges and franchises, may refuse to show its hand when charged with an abuse of such privileges."

It is argued by counsel for respondent that while such power may be safely granted to a grand jury, which is composed of citizens summoned from the body of the county or district in which the court may be held, and which, after the duties of its short session are ended, will be dissolved and have no further power, to grant such privilege of investigation to an administrative body, having a more or less permanent existence, its members being appointed by and removable by the executive authority of the government, would be to authorize searches and seizures forbidden by the Constitution. Our Supreme Court has not taken that view. In Interstate Commerce Commission v. Goodrich Transit Company, 224 U. S. 194, 32 S.Ct. 436, 56 L.Ed. 729, the court was called upon to determine the validity of certain orders of the Interstate Commerce Commission requiring carriers engaged in interstate commerce to keep accounts in a prescribed manner and to make reports concerning their corporate

organization. The court in that case held that the Commission had authority to demand of the carriers that they make detailed reports of their accounts. If Congress, under its power to regulate interstate commerce may prescribe the methods of keeping accounts by carriers engaged in such commerce and require the carriers to submit detailed accounts of their business to the Commission, it seems to me it follows that the Administrator of the Wage and Hour Division may require corporations engaged in interstate commerce to keep and report, or produce at the request of the Administrator, accounts of wages and hours of its employes engaged in that commerce. See also American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 237, 57 S. Ct. 170, 81 L.Ed. 142.

The power of an administrative official to require reports was upheld by Judge Wilkerson in Bartlett Frazier Co. v. Hyde, D.C., 56 F.2d 245, affirmed by the Circuit Court of Appeals of this circuit, 65 F.2d 350. In that case it was said by Judge Wilkerson, "the government agents claim and exercise the right to examine the books of members [of the Board of Trade] without notice and without the pendency of any proceedings either in court or under the provisions of the [Grain Futures] act." Continuing Judge Wilkerson said: "It is difficult to see how the purpose of the act can be carried out unless the regulatory agencies are able to inform themselves as to the transactions in futures conducted on boards of trade by their members. To sustain the part of the act prescribing the duty and conferring the power to regulate Boards of Trade and to strike down the part which puts the government in possession of the facts essential to an intelligent performance of its duty is to confer the shadow and withhold the substance of authority."

And Judge Alschuler in his opinion affirming Judge Wilkerson said [65 F.2d 352]: "It is argued that, because under the law inspections may be made and reports required where there is no charge, suggestion, or intimation of conduct contrary to the law, the act is unreasonable and void. It does not appear that appellants were charged with, or were suspected of, any transgression of the law. Assuming that by the declared statutory purpose of preventing corners and speculation in grains the public interest is subserved.

this purpose would be seriously embarrassed if the government were powerless to require the information without regard to whether traders such as appellants were suspected of, or charged with, breaking the law. Indeed, the very requirement of the information would of itself have tendency to discourage the unlawful manipulations at which the act is aimed."

See also U. S. v. Clyde S. S. Co., 2 Cir. 36 F.2d 691; Karr v. Baldwin, D.C.N.D. Tex., 57 F.2d 252, and McMann v. Securities and Exchange Commission, 2 Cir., 87 F.2d 377, 379, 109 A.L.R. 1445, where Judge Learned Hand, said: "No doubt a subpœna may be so onerous as to constitute an unreasonable search. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786. Even then, the sanction is unobjectionable, unlike a descent upon one's dwelling or the seizure of one's papers; the search is 'unreasonable' only because it is out of proportion to the end sought, as when the person served is required to fetch all his books at once to an exploratory investigation whose purposes and limits can be determined only as it proceeds. The investigation at bar was no such 'fishing excursion,' it was limited to transactions in the two companies, as to which the Commission already had some evidence of violations of the statute. The documents demanded were few and their production did not interfere with the business of Engel & Company. There was no oppression, or evidence of any other motive than a lawful investigation. Unless such subpœnas are valid, it is impossible to see how the statutes can be enforced at all, or how any wrongdoer can be brought to book."

It has been argued by counsel for respondent that the cases in which it has been held that the legislature may require records to be kept and submitted to administrative officers are those in which anti-social conduct such as the legislature might condemn was involved, citing narcotic and liquor cases. There can be no doubt, I believe, that at present the people of our country are convinced that the payment of wages below a level which will permit decent living conditions is anti-social and an evil which affects not only the particular wage earners but the community as a whole.

Counsel for respondent have relied largely upon Federal Trade Commission v. American Tobacco Company, 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786. But there is nothing in that case which conflicts with the holdings in the cases cited above. That was truly a "fishing expedition". Here the subpœna calls only for certain specified documents which, as I understand it, are the records showing the amounts paid in wages to the individual employes and the hours of employment of the employes.

It is, however, objected that the subpœna is too broad as covering employes engaged solely in intrastate commerce and executive and administrative employes who are exempt, under the Act, from the jurisdiction of the Administrator.

Respondent says that among the many employes in the Kansas City mail order house are a large number who are not covered by the Fair Labor Standards Act, executive and administrative and professional and local retailing employes; that it has always been willing, and is now, to furnish the records demanded by the Government that apply to employes covered by the Act, but that the subpœna demanding the records as to those not covered, as well as those covered by the Act, is unreasonable and should, therefore, be quashed.

But must the government take as true, and without investigation, respondent's statement that the records it refuses relate only to employes not covered by the Act? I think not. Concededly a very large part, much the greater part of respondent's business is interstate. Apparently, it will be difficult to determine which of the employes are covered by the Act and which are not. The only reasonable method of investigation open to the Government is to have all the records so that the Administrator may determine for himself who are covered and who are not. I am of the opinion that the Administrator is entitled to the entire payroll. Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 213–216, 32 S.Ct. 436, 56 L.Ed. 729; National Labor Relations Board v. New England Transportation Co., D.C., 14 F.Supp. 497.